IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
ABILENE DIVISION

| | | |
|---|---|---|
| CHARLES EPLEY, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 1:18-CV-00115-BU |
| | § | |
| DANIEL LOPEZ, *et al.*, | § | |
| | § | |
| Defendants. | § | |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATIONS
OF THE UNITED STATES MAGISTRATE JUDGE**

Plaintiff Charles Epley, formerly incarcerated by the Texas Department of Criminal Justice (TDCJ), filed this action under 42 U.S.C. § 1983 complaining of events alleged to have occurred during his three-day incarceration at TDCJ's French Robertson Unit in Abilene. *See* Dkt. No. 1. Epley alleges that he was denied medical care at the Robertson Unit in retaliation for reporting an incident of excessive force he claims occurred at TDCJ's Montford Unit in Lubbock the day before his transfer. *See* Dkt. No. 34. Epley first filed his claims in the Dallas division, and the case was transferred to the Lubbock Division. *See infra* Section III. Then, Epley's Robertson Unit claims were severed and transferred to the Abilene division of this Court, as the undersigned describes in more detail below. *See id.*

The Court granted Epley permission to proceed *in forma pauperis*, which subjects his Second Amended Complaint to the Court's preliminary screening measures under 28 U.S.C. §1915(e)(2). Dkt. No. 29. And because Epley was an inmate at the time he filed this action against government officials, his Second Amended Complaint is also subject to

1

screening under 28 U.S.C. § 1915A. Epley has not consented to a magistrate judge exercising the full jurisdiction of this Court, and thus the undersigned submits these Findings, Conclusions, and Recommendations for the dismissal of his claims. *See id.*

## I. PRELIMINARY SCREENING

A court may summarily dismiss a complaint filed *in forma pauperis* if the court determines the complaint is frivolous or malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief. 28 U.S.C. § 1915(e)(2)(B).

A frivolous complaint lacks any arguable basis, either in fact or in law, for the wrong alleged. *Neitzke v. Williams*, 490 U.S. 319, 325 (1989). A complaint lacks an arguable basis in fact if it rests upon clearly baseless factual contentions, and similarly lacks an arguable basis in law if it contains indisputably meritless legal theories. *See id.* at 327; *Geiger v. Jowers*, 404 F.3d 371, 373 (5th Cir. 2005).

Dismissal for failure to state a claim—whether under Section 1915(e)(2)(B)(ii), Section 1915A(b)(1), or Rule 12(b)(6)—"turns on the sufficiency of the 'factual allegations' in the complaint." *Smith v. Bank of Am., N.A.*, 615 F. App'x 830, 833 (5th Cir. 2015) (per curiam) (quoting *Johnson v. City of Shelby*, 574 U.S. 10, 12 (2014) (per curiam)). Thus, if a plaintiff "plead[s] facts sufficient to show" that the claims asserted have "substantive plausibility" by stating "simply, concisely, and directly events" that they contend entitle them to relief, the claims should not be dismissed merely because the plaintiff fails to articulate the proper legal theory that otherwise makes those facts

actionable in court. *Johnson*, 574 U.S. at 11–12 (citing Fed. R. Civ. P. 8(a)(2)–(3), (d)(1), (e)).

Courts accept *well-pleaded* factual allegations as true. *Chhim v. Univ. of Tex. at Austin*, 836 F.3d 467, 469 (5th Cir. 2016) (emphasis added). This means the factual allegations, while not required to be detailed, must amount to more than mere labels, conclusions, or a statement of the legal elements of a claim. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)); *see also Chhim*, 836 F.3d at 469 (5th Cir. 2016).

For claims to be substantively plausible, a plaintiff need not establish that the pleaded facts probably occurred as alleged, but the facts must allow the court "to infer more than the mere possibility of misconduct." *Harold H. Huggins Realty, Inc. v. FNC, Inc*., 634 F.3d 787, 796 (5th Cir. 2011) (quoting *Iqbal*, 556 U.S. at 678–79). Even pro se plaintiffs must plead facts that raise the right to relief above a speculative level. *Chhim*, 836 F.3d at 469 (citing *Taylor v. Books A Million, Inc.*, 296 F.3d 376, 378 (5th Cir. 2002)). And when plaintiffs "have not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed." *Twombly*, 550 U.S. at 570.

When evaluating a complaint under these standards, courts liberally construe the pleadings of pro se plaintiffs, holding their complaints to "less stringent standards than formal pleadings drafted by lawyers." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). But "liberal construction does not require that the Court . . . create causes of action where there are none." *Smith v. CVS Caremark Corp.*, No. 3:12-cv-2465-B, 2013 WL 2291886, at *8 (N.D. Tex. May 23, 2013). "To demand otherwise would require the 'courts to explore

exhaustively all potential claims of a *pro se* plaintiff'" and would "'transform the district court from its legitimate advisory role to the improper role of an advocate seeking out the strongest arguments and most successful strategies for a party.'" *Jones v. Mangrum*, No. 3:16-cv-3137, 2017 WL 712755, at *1 (M.D. Tenn. Feb. 23, 2017) (quoting *Beaudett v. City of Hampton*, 775 F.2d 1274, 1278 (4th Cir. 1985)).

Ultimately, "'[d]etermining whether a complaint states a plausible claim for relief' is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *Inclusive Communities Project, Inc. v. Lincoln Prop. Co.*, 920 F.3d 890, 899 (5th Cir. 2019) (quoting *Iqbal*, 556 U.S. at 679).

## II. FACTUAL BACKGROUND

Epley is a French national who was incarcerated by TDCJ for approximately twenty-eight (28) years until his release in February 2018. Dkt. No. 34 at 6–7; Dkt. No. 9 at 1. He has since returned to France. Dkt. No. 34 at 6. His claims in this Abilene division case arise from three days in June 2016, when he was at the Robertson Unit during his transfer from the Montford Unit in Lubbock to the Lynaugh Unit in Fort Stockton. *See id.* Epley alleges that while at the Robertson Unit, he was subjected to deliberate indifference to serious medical needs by Sergeant Daniel Lopez and a medical official identified by Epley only as "Blue."[1] *Id.* at 8, 12–13.

---

[1] As part of the preliminary screening process and to help Epley in the factual development of his claims, the undersigned entered an Order for a *Martinez* report requiring TDCJ to review internal records to identify Blue and other non-defendants referenced in Epley's claims. *See* Dkt. No. 53; *Martinez v. Aaron*, 570 F.2d 317 (10th Cir. 1978). The Office of the Attorney General, as *amicus curiae*, filed the *Martinez* report, stating that TDCJ and Texas Tech University Health Services Center (TTUHSC), who provided medical staff to the Robertson Unit, were unable to identify Blue because TTUHSC did not maintain records of staff subcontracted through Hendrick Hospital to the Robertson Unit, and because TDCJ records from June 7–9, 2016, the dates in question, were expired under TDCJ

During his incarceration but prior to his arrival at the Robertson Unit, Epley was diagnosed with Post Traumatic Stress Disorder (PTSD) with a history of traumatic brain injuries (TBI) and recurring depressive episodes. *Id.* at 9. Epley states that among his PTSD and TBI symptoms are "confusion particularly during stressful situations . . . [and] feelings of unreality during which he does not know if what he sees is real . . . ."[2] *Id.* Epley states that his mental health conditions, which are a "result of the trauma [he] suffered inside the prisons," cause him to become confused and to struggle with presenting his factual claims. Dkt. No. 63 at 35. As part of his long-term psychiatric and medical treatment at TDCJ, Epley takes prescription medications and has a documented disability accommodation for housing in a single-occupancy cell. *Id.* at 10; Dkt. No. 51 at 6.

A. Montford Unit events

On June 6, 2016, the day before Epley began his transfer from the Montford Unit to the Lynaugh Unit, he was involved in a use-of-force incident at the Montford Unit and claims to have suffered injuries as a result. This incident and the alleged resulting injuries are the subject, at least partially, of his Lubbock division lawsuit.[3] Dkt. No. 51 at 12. Epley's factual allegations in the Lubbock division case regarding the June 6 use-of-force

---

Records Retention Policy and Schedule. *See* Dkt. No. 60. Although the undersigned was unable to identify Blue at the preliminary screening stage, the undersigned recommends that Epley's claims against Blue be dismissed with prejudice for the reasons explained below. If the Senior District Judge finds that any of the claims against Blue survive screening, the undersigned further recommends that Epley be permitted to engage in limited discovery to identify and serve Blue with process in this matter.

[2] Regardless of Epley's stated inability to distinguish reality from fiction, a symptom he repeatedly asserts, the undersigned considers Epley's stated facts as true, as the Court must at the preliminary screening stage. *See Chhim*, 836 F.3d at 469.

[3] In that lawsuit, Epley asserts that TDCJ officials orchestrated Epley's transfer to different prison facilities to dissuade him from filing a religious liberties lawsuit. *See Epley v. Gonzalez, et al.*, No. 5:18-CV-142-BQ, 2019 WL 2583143 (N.D. Tex. May 29, 2019), *report and recommendation adopted*, 2019 WL 2579231 (N.D. Tex. June 24, 2019), *aff'd in part, reversed in part* 860 F. App'x 310 (5th Cir. 2021).

incident and resulting injuries—occurring as they did the day before Epley's arrival at the Robertson Unit—also inform the Court's consideration of Epley's deliberate indifference claims at the Robertson Unit. For this reason, the undersigned summarizes those allegations here as taken from the Report and Recommendation of the United States magistrate judge in Epley's Lubbock division case, which was adopted by the Senior District Judge.

In the Lubbock division Report and Recommendation, the magistrate judge recommended dismissing all Epley's claims, including his claims of excessive force and deliberate indifference to serious medical needs. *See* Civil Action No. 5:18-CV-00142-BQ, Dkt. No. 57. The Senior District Judge adopted those recommendations and dismissed all Epley's claims and entered a final judgment. Dkt. Nos. 71, 72. Epley appealed the order and judgment, but only the dismissal of his claims for disability discrimination. Dkt. No. 82. The Fifth Circuit reversed the dismissal of those claims, concluding that Epley had stated a claim under the Americans with Disabilities Act of 1990 as Amended, 42 U.S.C. § 12132 (ADA) and Section 504 of the Rehabilitation Act (Rehab Act). *Id.* Those claims, as asserted against the TDCJ, remain pending in the Lubbock division case. *See* Dkt. Nos. 117, 119.

Epley claimed in the Lubbock division case that, as a result of the use of force, "he suffered broken ribs, a broken nose, a concussion, and injuries to his head, neck, face, right eye, right ear, and teeth." Dkt. No. 57 at 4. Additionally, he claimed to have suffered a traumatic brain injury (TBI), knee pain, and psychiatric complications. *Id.*

But the magistrate judge in that case observed that "[b]y Epley's own admissions, and as reflected in the authenticated records, Epley suffered a TBI years before June 6,

2016, which caused many of the symptoms he alleges he continues to experience as a result of the June 6 incident, such as "excruciating migraine attacks, confusion particularly during stressful situations, sleeping disturbances, chronic fatigue, feelings of unreality . . . anxiety and panic attacks, vivid and distressing flashbacks and nightmares, severe and recurrent depressive episodes." *Id*. at 7 n.9.

Epley also claimed in the Lubbock division case that following the use of force, and being placed in a four-person cell, he asked for medical treatment from anyone who happened to walk by. *Id*. at 5. The magistrate judge reported that Epley acknowledged "that he did not formally request medical treatment, despite being given the opportunity to do so, until June 10, 2016—four days after the use of force—because, according to Epley, he 'was overwhelmed by extreme fear' and his injuries made it difficult 'to think coherently.'" *Id*. This would mean that Epley did not formally request medical treatment until he arrived at the Lynaugh Unit—which occurred after he departed the Robertson Unit. *See id.*

In analyzing Epley's excessive force claim, the Lubbock division magistrate judge discussed the extent of Epley's claimed injuries, which again are relevant here to his deliberate indifference claims arising at the Robertson Unit. The magistrate judge noted that Epley claimed to have suffered "a host of physical and psychological ailments as a result of the June 6 incident," including "broken ribs, a broken nose, a concussion, and injuries to his head/brain, neck, face, right eye, right ear, and teeth." *Id.* at 7. But the magistrate judge also noted that "the video footage and still photos from TDCJ show that Epley had a bloody nose as well as several scratches and red, bruised skin following the use of force." *Id.*  The magistrate judge also noted that:

The video also reflects that after the incident, Sergeant Gonzalez asked Epley several times if he was injured, but Epley refused to answer, instead muttering unintelligibly in French. Nurse Wagner visually examined Epley's face and used a towel to wipe the blood from his face and nose. The video shows that Epley did not grimace or react in any way as Wagner wiped his face, including his nose. Based on her visual examination and Epley's lack of response, Nurse Wagner determined that Epley had not suffered any injuries (other than scratches and a bloody nose). On video, Epley was alert and coherent (albeit distraught), and did not display any outward signs of pain or other injury as Defendants escorted him to his assigned cell. The authenticated video footage negates many of the more serious injuries alleged by Epley, e.g., a broken nose and external injuries to his head, teeth, right eye and ear, and thereby relieves the court of accepting said allegations as true.

*Id.* at 7–8.

The magistrate judge concluded that the "[t]he injuries the video footage reflects Epley did suffer—a bloody nose, abrasions, and bruised, red skin—are minor, if not *de minimis*, injuries." *Id.* at 8–9. And that:

Moreover, the authenticated medical records do not reflect Epley suffered the injuries he has alleged. For example, Epley claims his ribs were broken on June 6, but the records do not reflect such a diagnosis. Instead, they show that after Epley complained of rib pain, TDCJ medical staff at the James Lynaugh Unit (Lynaugh Unit) ordered x-rays to "rule out" a possible rib fracture, but Epley refused the x-rays. The nurse noted that Epley was possibly suffering from "costochondritis"-inflammation of the rib cartilage. Epley similarly refused x-rays of his neck and right knee, despite complaining of pain, as well as a dental exam. Thus, medical staff was unable to conduct a thorough analysis of the cause of his subjective pain.

*Id.* at 9.

After analyzing other aspects of Epley's excessive force claim, the Lubbock division magistrate judge determined that the Montford Unit officers used no more force than reasonably necessary to restore order and achieve Epley's compliance with their orders during the brief struggle of less than 60 seconds. *Id.* at 11–14. Based on these

findings, the magistrate judge ultimately reached the conclusion, adopted by the Senior District Judge and not appealed by Epley, that Epley's excessive force claim should be dismissed as frivolous and for failure to state a claim. *Id*. at 16; Dkt. No. 71.

Regarding Epley's deliberate indifference to serious medical needs claim, the Lubbock division magistrate judge reported that Epley claimed that after the use of force, "'[t]he fear of being brutalized more prevented [him] from asking for the medical treatment in the presence of the defendants who had caused [him] to be injured.'" Dkt. No. 57 at 18. Epley further alleged in that action that he "'asked everybody who happened to walk near the four-person cell that evening [for medical treatment],' but '[t]hey walked away, some of them laughing.'" *Id*. And that at other times, his cellmates "'prevented [him] from trying to call the officials for help.'" *Id.*

The Lubbock division magistrate judge noted that the video taken following the incident depicts a nurse examining Epley immediately after the use of force occurred and Epley denying being injured. *Id*. at 20. After the nurse examined Epley and questioned him about his injuries, she determined that Epley did not require medical treatment. *Id*.

Even construing Epley's allegations in the Lubbock division case most favorably to Epley, the magistrate judge concluded that his deliberate indifference claim amounted to nothing more than negligence, malpractice, or disagreement with treatment, and not deliberate indifference under Section 1983. *Id*. at 25.

B.  Robertson Unit events

Turning now to Epley's Abilene division claims, Epley states that he was transferred to the Robertson Unit on June 7, 2016, while en route to the Lynaugh Unit, and that he

arrived at the Robertson Unit with untreated physical injuries from the use-of-force incident at the Montford Unit.[4] Civil Action No. 1:18-cv-00115, Dkt. No. 51 at 7, 12. Epley states that because of the incident at the Montford Unit the day before, he had "severe generalized pain" in his shoulder, knees, and front teeth, blurred vision, and broken ribs; Epley alleges that "he could barely walk," and had bruises on his face and body. Dkt. No. 34 at 4–5, 11–12; Dkt. No. 63 at 16.

Upon arrival at the Robertson Unit, Epley states that he exited the TDCJ bus into a triage area outside the Administrative-Segregation (Ad-Seg) building that housed transfer prisoners. Dkt. No. 34 at 10. At the triage area, Epley claims he asked a "white female medical professional on duty" for medical care. *Id.* Epley states that when he started to speak to the female nurse, the TDCJ bus driver "rushed toward the security officials" and told the nurse and other nearby security officials, including a "large and tall Hispanic security official," that "per the 'Montford prison' [Epley] was to be denied medical treatment for his injuries." *Id.* at 10; Dkt. No. 51 at 11, 23. Epley claims the female nurse then "told [Epley] to shut-up and to go to Administrative-Segregation." Dkt. No. 34 at 11. In a later statement of his claims, Epley alleges the nurse said that she would not provide him any medical care because the Montford Unit officers wanted him to be hurt. Dkt. No. 51 at 11.

---

[4] Epley attempts to bring claims related to the Montford-to-Robertson bus transport, namely that transportation in a TDCJ bus, rather than a medical transport, was a violation of the ADA, and that the TDCJ bus driver was deliberately indifferent to Epley's serious medical needs because he ignored Epley's repeated requests for medical care. *See Epley*, 2019 WL 2583143. Epley's Montford-to-Robertson transport claims continue in litigation in the Lubbock division and are not addressed here.

Epley claims that he was then escorted from the triage area into the Ad-Seg transit building by the Hispanic guard who, once inside, told Sergeant Daniel Lopez that, per Montford Unit officials, Epley was not to receive medical treatment. Dkt. No. 34 at 11. Epley claims that Lopez "shook his head indicating that he understood, [and would] go along with the instruction . . . ." *Id.*; Dkt. No 63 at 15; Dkt. No. 51 at 24.

Epley states that he told Lopez that he was in pain, showed him his injuries, and asked to go to medical. Dkt. No. 63 at 15. Epley alleges that his injuries were so severe that Lopez, a supervisor, should have known Epley needed immediate medical care. *Id.* at 16–17. Rather than take Epley to the infirmary, Lopez threatened Epley "with additional harm" and disciplinary action if Epley did not climb the stairs and walk into his assigned single-occupancy cell. Dkt. No. 51 at 24; Dkt. No. 34 at 12.

Epley states that Lopez, acting on the directions of the Hispanic guard and the TDCJ bus driver, intentionally "blocked [Epley's] access to . . . much-needed medical care and much-needed accommodations by refusing to alert/diligently inform the providers of [his] injuries which required medical care/treatments and accommodations." Dkt. No. 63 at 14–17.

Inside the single-occupancy cell, Epley states that the cell conditions further harmed him. *See* Dkt. Nos. 51, 63. Epley claims that, due to his injuries, he should have been placed in the infirmary, not a standard single-occupancy cell. Dkt. No. 51 at 6–7; Dkt. No. 63 at 2. Epley states that the pain from his injuries prevented him from bending to access food trays, medication, and the toilet without excruciating pain. Dkt. No. 34 at 12; Dkt. No. 51 at 3–4; Dkt. No. 63 at 9. Epley states that because he could not access the food tray slot, he

was denied all food and some doses of his prescribed medication during the three-day stay at the Robertson Unit. Dkt. No. 51 at 20. Epley alleges that other facts show his obvious need for medical housing, such as his difficulty climbing stairs, but states that those facts are too numerous to list. Dkt. No. 63 at 4.

Epley also states that Robertson Unit officials used the cell conditions to intentionally harass him or intimidate him from attempting to access the food trays. Dkt. No. 63 at 28. Epley states that TDCJ officials prevented him from sleeping by yelling and keeping an exterior light and a small interior cell light on 24-hours a day. *Id.* at 23; Dkt. No. 34 at 12. Epley states that he does not know how much sleep he was deprived of but claims that he was always tired. Dkt. No. 63 at 26.[5]

Once inside the single-occupancy cell, Epley alleges that a nurse known as "Blue," who was a "medical official dispensing the prescribed medications to the prisoners," came to his cell. Dkt. No. 34 at 12. Epley states that he told Blue about his severe pain and the cell conditions, and requested medical care. Dkt. No. 63 at 19. Epley states that when Blue saw his condition, "she was initially horrified" and told Epley she would send notice for a medical exam. *Id.*; Dkt. No. 34 at 12. Epley states he saw Blue later when she came to his cell to dispense medications, but that she ignored his requests for help. Dkt. No. 63 at 20; Dkt. No. 34 at 12. Epley states that he never went to the infirmary or otherwise received

---

[5] Although Epley does not appear to assert conditions of confinement claim under the Eighth Amendment, even if he did, his factual allegations would fail to state a claim. *See Chavarria v. Stacks*, 102 F. App'x 433, 436–37 (5th Cir. 2004) (holding that twenty-four-hour illumination of administrative segregation cells did not violate the Eighth Amendment); *Walker v. Nunn*, 456 F. App'x 419, 421–22 (5th Cir. 2011) (holding that a prisoner's allegations of sleep deprivation must demonstrate that the deprivation was objectively, sufficiently serious).

medical care during his three-day stay at the Robertson Unit, from June 6 to June 9, 2016, when he was transferred to the Lynaugh Unit.[6] Dkt. No. 34 at 8, 12.

Epley claims that Lopez and Blue should have provided him with a housing accommodation for a bed in the infirmary with side rails, motorized height adjustments, and a "pain-reducing" mattress. Dkt. No. 63 at 2. Epley states that Lopez and Blue knew of his need for accommodations because Epley told them of his pain and need for medical care. *Id.* at 27.

Epley also alleges that his medical condition was further harmed by the transportation conditions to the Lynaugh Unit on June 9, 2016. Dkt. No. 51 at 4–6. Once again placed on a TDCJ bus for this leg of the transfer, Epley states that he suffered excruciating pain from being "squeezed" in with other prisoners and handcuffed in a stress position, which prevented him from moving and caused severe pain. *Id.* at 4, 12.

C.  Lynaugh Unit events

Epley states that the medical assessments at the Lynaugh Unit documented the severity of his injuries that he presented to Lopez and Blue. Dkt. No. 63 at 4. The Lynaugh Unit medical and mental health records were included in the authenticated records from TDCJ. Those records show that Epley received a mental health assessment on the day he

---

[6] The authenticated records include a Robertson Unit in-take medical review on June 7, 2016, conducted by Nurse Sparks, which states that Epley denied any wound care needs and noted his accommodation for single-cell housing. Epley claims that this record is false because he asked for medical care. Dkt. No. 51 at 16–17. Epley alleges that TDCJ has an "established practice/custom/policy" of compiling prisoner "medical records without ever seeing the prisoners." Dkt. No. 51 at 8. He states, as offered proof of the record's fabrication and that the exam never occurred, TDCJ cannot conduct a medical examination at triage, in the presence of other prisoners, because such an exam violates HIPPA privacy protections. *Id.* at 14. Ultimately, the undersigned need not resolve conflicts between the authenticated medical records and Epley's allegation of widespread medical record fraud because the undersigned finds that Epley's deliberate indifference to serious medical need claim, and all claims relying on the same operative facts, should be dismissed, even without considering the in-take medical examination record.

arrived at the Lynaugh Unit, June 9, 2016, which noted that Epley had a "scratch to the bridge of his nose, some bruising under each eye, bruises to his left leg and a quarter size scratch to the left side of his abdominal area." The mental healthcare provider referred Epley for medical and dental evaluations.

At Epley's medical examination at the Lynaugh Unit, conducted on the following day, the medical care provider noted that Epley had a bruised and swollen nose, limited range of motion in his shoulder, and was in "mild distress [with] subjective pain in chest." The provider also noted slightly diminished peripheral vision and a possible concussion. The medical provider diagnosed Epley with left shoulder pain, and ordered a shoulder and chest x-ray to rule out possible fracture. Epley was also prescribed a pain reliever.

Epley later refused the shoulder and chest x-ray, and other x-rays prescribed later, writing on the refusal form that he believed officers would retaliate against him for accessing prescribed treatment and that x-rays were known to be unsafe. Epley demanded a CAT scan instead, which prison officials refused him.

Even without the prescribed diagnostics, a second evaluation on June 14, 2016, noted that Epley stated his shoulder and rib pain were better. Epley was evaluated by the Lynaugh Unit dentist on June 28, 2016, who noted that Epley had no current treatment needs. Epley has not claimed further pain or complications from his physical injuries.

Epley seeks compensatory and punitive damages, as well as the costs of litigating his claims. Dkt. No. 34 at 15–16.

### III. PROCEDURAL HISTORY

As explained above, Epley initially filed this suit in the Dallas division against Defendants employed in both the Montford Unit and the Robertson Unit, alleging liability under federal and state laws for actions related to the alleged excessive force incident on June 6, 2016, and the subsequent denial of medical treatment. *See generally Epley v. Gonzalez, et al.*, No. 5:18-CV-142-BQ, 2019 WL 2583143 (N.D. Tex. May 29, 2019), *report and recommendation adopted*, 2019 WL 2579231 (N.D. Tex. June 24, 2019), *aff'd in part, reversed in part* 860 F. App'x 310 (5th Cir. 2021).

After the suit was transferred to the Lubbock division, Epley's claims against the Robertson Unit Defendants Lopez and Blue were severed and transferred to the Abilene division. Dkt. No. 24.

The Lubbock division Senior District Judge dismissed all Epley's claims, including claims arising from facts similar to those alleged in this lawsuit. Civil Action No. 5:18-CV-00142-BQ, Dkt. No. 72. And Epley did not appeal dismissal of his Section 1983 claims when he sought Fifth Circuit review of his allegations of disability discrimination for failure to provide housing and transportation accommodations. *See Epley*, 860 F. App'x at 314–15. Also as explained above, Epley's ADA and Rehab Act claims against the TDCJ remain pending in the Lubbock division case. *See* Dkt. Nos. 117, 119.

Once the claims against the Robertson Unit Defendants were transferred to the Abilene division, the Court ordered Epley to restate his Abilene division claims (Dkt. No. 29), and Epley filed his Second Amended Complaint on October 15, 2018, which is the

operative pleading here. Dkt. No. 34. The Court also sought information from TDCJ in the form of the relevant authenticated records and, later, a *Martinez* report to identify Blue and John/Jane Doe defendants. *See* Dkt. Nos. 43, 53.

Since the Court severed and transferred Epley's claims against Lopez and Blue to the Abilene division, Epley has attempted to add additional defendants to the Abilene division case on at least three occasions, each of which has been denied. *See* Dkt. Nos. 32, 34, 35, 37, 40, 51, 63. Epley's repeated efforts in this regard have been aimed at adding to the Abilene division case claims against defendants which either remain in the Lubbock division case or claims against Lynaugh Unit defendants that have been severed and transferred to the Western District of Texas. *See* Dkt. No. 35 at 2. For this reason, the Court limits its consideration here to Epley's claims against Lopez and Blue.

And since the transfer of the Abilene division claims, Epley has had ample opportunity to fully develop his claims against Lopez and Blue. In addition to ordering Epley to replead, the Court aided Epley in the factual development of his claims by ordering him to complete a Magistrate Judge's Questionnaire. Dkt. No. 48. When his Questionnaire Responses failed to answer the Court's questions, the undersigned ordered a telephonic evidentiary hearing under *Spears v. McCotter*, 766 F.2d 179, 181–82 (5th Cir. 1985). Dkt. No. 52. Epley, however, moved the Court to vacate the hearing and accommodate his psychological disabilities by allowing him to respond to the Court's questions in writing. Dkt. No. 55. The Court granted his Motion and Ordered Epley to complete a Second Questionnaire. Dkt. No. 57. Epley responded to the Second Questionnaire, after being granted an extension. Dkt. Nos. 58, 59, 60.

16

Despite numerous opportunities and voluminous filings, Epley has failed to provide sufficiently specific facts to support his claims, including through his Responses to the two Questionnaires. Although the Court ordered Epley to respond to the Questionnaires "with facts specific to the question asked," Epley's responses and accompanying documents totaled more than 250 pages, including statements regarding non-defendants, facts unrelated to his claims, and multiple exhibits of information unrelated to the Defendants' alleged conduct. *See* Dkt. Nos. 51, 63. And even after requesting and receiving an extension to respond, Epley only responded to three out of the twelve questions the Court asked in the Second Questionnaire, stating that he did not have enough time to provide more complete responses despite the extension. *See* Dkt. No. 63.

The undersigned, nevertheless, liberally construes Epley's pro se pleadings, and at this stage of proceedings, accepts all well-pleaded facts as true. After review of the voluminous record, the undersigned now RECOMMENDS dismissal of all Epley's claims.

## IV.  DISCUSSION AND ANALYSIS

Epley's core claim is that he was denied medical care and accommodations during the three days he was at the Robertson Unit. But Epley explains through his Second Questionnaire Responses that he brings this claim under several legal theories to avoid having his case dismissed. *See* Dkt. No. 63 at 21–22. Thus, Epley claims that Lopez and Blue violated his rights under several federal and state laws. *See* Dkt. Nos. 34, 51, 63. He brings Section 1983 claims under the First Amendment, the Eighth Amendment, and the Fourteenth Amendment's Equal Protection Clause (as clarified in Dkt. No. 63 at 21). Epley further alleges these violations were done in a conspiracy among TDCJ officials in

17

violation of 42 U.S.C. §§ 1983, 1985, and 1986. Dkt. No. 34 at 14–15. And he also brings claims under Title II of the ADA and Section 504 of the Rehab Act. *Id.* at 15. Finally, Epley alleges that, beyond federal liability, Defendants also violated state tort law and Texas Penal Code § 22.04.[7] *Id.* at 3, 7.

As explained above, the Court's focus at this stage is on the sufficiency of the factual allegations, not the precision with which Epley states his legal theories. *See Smith*, 615 F. App'x at 833. Nevertheless, the undersigned begins the analysis by following Epley's legal theories.

A. Claims under the First, Eighth, and Fourteenth Amendments

Epley alleges that Lopez and Blue denied him medical care for his injuries, and then retaliated against him for "having reported the misuse of force and for having sought" medical care. Dkt. No. 34 at 3. Although Epley does not state whether he brings his Section 1983 claims against Lopez and Blue in their official or individual capacities, the undersigned construes these claims as individual capacity claims because Epley seeks money damages, and he has no official capacity claim against Lopez and Blue for money damages.[8] *See* Dkt. No. 34 at 15–16. The Eleventh Amendment bars suits for money

---

[7] Generally, Texas Penal Code § 22.04 makes it a crime for a person to intentionally, knowingly, recklessly, or with criminal negligence cause physical or mental injury to a child, elderly individual, or disabled individual.

[8] To the extent that Epley alleges Blue is not a TDCJ employee but a contract employee, the result remains the same. Private doctors performing contract medical services to prisoners are state actors for the purposes of Section 1983. *See West v. Atkins*, 487 U.S. 42, 49–50 (1988) (finding a physician who provides medical services to prison inmates under a government contract acts under color of state law). Medical personnel like Blue are contract employees of TDCJ, providing medical care to inmates at the Robertson Unit through a contract with the TTUHSC and Texas Tech's Correctional Managed Health Care Division, and further subcontract with Hendrick Hospital. *See* Dkt. No. 60. And courts in the 5th Circuit have found that universities providing contracted medical care for incarcerated individuals are entitled to Eleventh Amendment immunity as an arm of the state. *See Bowens v. Fed. Bureau of Prisons*, No. Civ.A. 1:04CV688, 2005 WL 3133475, at 6–8 (E.D. Tex. Nov. 23, 2005).

damages against state officials who are sued in their official capacities. *Virginia Off. for Prot. & Advoc. v. Stewart*, 563 U.S. 247, 253–56 (2011). As Epley seeks only monetary damages for his claims, the official capacity claims against Defendants are barred by the Eleventh Amendment. *See id.*

Moreover, Defendants cannot be liable for constitutional violations under Section 1983 in their official capacities. In *Will v. Mich. Dep't of State Police*, the Supreme Court held that a suable "person" under Section 1983 does not include a state, a state agency, or a state official sued in his official capacity for money damages. 491 U.S. 58, 71 (1989). The rationale underpinning this conclusion is that a Section 1983 claim against a person in that person's official capacity is, in effect, a suit against that person's office, and thus is no different than a suit against the state itself or the government entity that employs the person. *Id.* Here, Epley's claims for official capacity liability of TDCJ employees fail because, in this capacity, Defendants are not suable persons under Section 1983.

For these reasons, the undersigned will construe Epley's Section 1983 claims as individual capacity claims that Lopez and Blue's denial of medical care constituted (1) deliberate indifference to serious medical need under the Eighth Amendment, (2) discrimination under the Equal Protection clause of the Fourteenth Amendment, (3) a conspiracy with other TDCJ officials in violation of 42 U.S.C. §§ 1983, 1985, and 1986, and finally, (4) retaliation under the First Amendment. Dkt. No. 34 at 15.

1. *Deliberate indifference claims under the Eighth Amendment*

In his Second Amended Complaint, Epley states that Defendants denied him "much-needed medical, dental, and psychiatric treatments . . . in violation of the Eighth

19

Amendment." Dkt. No. 34 at 3. The undersigned first explains the standard for a deliberate

indifference claim before applying the standard to Epley's allegations.

    i.  *Legal standard for deliberate indifference*

Under the Eighth Amendment, prison officials have a duty to provide adequate

medical care. *See Rogers v. Boatright*, 709 F.3d 403, 409 (5th Cir. 2013). An inmate

seeking to establish an Eighth Amendment violation regarding medical care must allege

facts showing that prison officials were deliberately indifferent to his serious medical

needs. *Morris v. Livingston*, 739 F.3d 740, 747 (5th Cir. 2014) (quoting *Wilson v. Seiter*,

501 U.S. 294, 297 (1991) (explaining that because "only the 'unnecessary *and wanton*

infliction of pain' implicates the Eighth Amendment, a prisoner advancing such a claim

must, at a minimum, allege 'deliberate indifference' to his 'serious' medical needs"

(emphasis in original)).

Deliberate indifference "is an 'extremely high' standard to meet" (*Brewster v.

Dretke*, 587 F.3d 764, 770 (5th Cir. 2009)), and requires satisfaction of both an objective

and a subjective component. *Rogers*, 709 F.3d at 410. An inmate must first prove objective

exposure to a serious medical need that creates substantial risk of serious bodily harm.

*Gobert v. Galdwell*, 463 F.3d 339, 345–46 (5th Cir. 2006). "A serious medical need is one

for which treatment has been recommended or for which the need is so apparent that even

laymen would recognize that care is required." *Id.* at n.12. Stated another way, a serious

medical need is one for which denial of treatment is "much more likely than not to result

in serious medical consequences." *Bailey v. Dall.*, Civil Action No. 3:05-CV-0637-B, 2007

WL 9717914, at *3 (N.D. Tex. May 9, 2007). The objective component is satisfied where,

after considering all the facts and circumstances known to the defendant, a reasonable person would have perceived that the inmate was exposed to a substantial risk of serious bodily injury or serious medical consequences. *See Farmer v. Brennan*, 511 U.S. 825, 837–42 (1994); *see also Bailey*, 2007 WL 9717914, at *3.

"But an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned" as an Eighth Amendment violation. *Farmer*, 511 U.S. at 838. And for this reason, deliberate indifference also requires a subjective component. Satisfaction of the subjective component requires that a prison official (1) knows the inmate faces a substantial risk of serious harm, and (2) disregards that risk by failing to take reasonable measures to abate it. *Gobert*, 463 F.3d at 346; *see also Harris v. Hegmann*, 198 F.3d 153, 159 (5th Cir. 1999) (stating a prison official is not liable for denial of medical treatment unless he knows of and disregards an excessive risk to inmate health or safety).

"[D]eliberate indifference cannot be inferred merely from a negligent or even a grossly negligent response to a substantial risk of serious harm." *Thompson v. Upshur*, 245 F.3d 447, 459 (5th Cir. 2001). Instead, a prison official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Brewster*, 587 F.3d at 770 (quoting *Farmer*, 511 U.S. at 837); *see Lawson v. Dall.*, 286 F.3d 257, 262 (5th Cir. 2002) (noting that deliberate indifference is a "subjective inquiry," and inmate must show prison official was actually aware of risk of harm and consciously ignored it).

ii. *Epley's deliberate indifference claim*

Epley alleges that Lopez and Blue denied him "much-needed medical, dental, and psychiatric treatments" because they "failed/refused to timely alert" Robertson Unit medical providers to Epley's need for medical care. Dkt. Nos. 34 at 3; Dkt. No. 63 at 6. Epley states that while at the Robertson Unit, he had severe generalized pain in his shoulder, knees, and front teeth, blurred vision, and broken ribs stemming from the use-of-force incident at the Montford Unit. Dkt. No. 34 at 4–5. Epley claims he struggled to walk and had bruises on his face and body. *Id.* at 11–12; Dkt. No. 63 at 16. Epley also claims that while at the Robertson Unit he was denied treatment for pre-existing psychiatric medical needs attributed to his PTSD, TBI, and severe recurring depressive episodes because he was unable to access medication dispensed through the cell door food-tray slot. Dkt. No. 34 at 4–5; Dkt. No. 63 at 9.

Applying the "extremely high standard" for deliberate indifference, Epley fails to state a plausible claim against Lopez or Blue under both the objective and subjective components. Objectively, there are insufficient facts to plausibly support that Epley faced a substantial risk of serious harm. In other words, that the denial of treatment for Epley was "much more likely than not to result in serious medical consequences." *See Bailey*, 2007 WL 9717914 at *3. The facts and circumstances alleged by Epley are that he requested medical care when he was walking and talking on his own, was able to climb stairs to his cell, and had no difficulty breathing or seeing. *See* Dkt. No. 34 at 11–12; Dkt. No. 63 at 16. From an objective standpoint, and accepting Epley's allegations as true, Epley did not

present with severe injuries or a need that was so apparent that even a layperson would recognize it. *See Gobert*, 463 F.3d at 345 n.12.

The symptoms Epley complains of do not alone demonstrate a substantial risk of serious bodily harm. Without other hallmarks of an objectively serious medical need, or serious medical consequences for non-treatment like surgical intervention, complaints of pain and non-life-threatening injuries cannot constitute a serious medical need. *See, e.g.*, *Petzold v. Rostollan*, 946 F.3d 242, 249–50 (5th Cir. 2019) (no deliberate indifference where a prisoner limped and continued to complain of pain, which was diagnosed as a fracture two days later); *but c.f. Coleman v. Sweetin*, 745 F.3d 756, 765–66 (5th Cir. 2014) (allegations that prison officials ignored prisoner's complaints of a broken hip and severe pain were sufficient to raise the possibility of deliberate indifference); *see also Harris*, 198 F.3d at 159–60 (holding that a prisoner stated a deliberate indifference claim when he alleged that prison officials only performed a cursory inspection of his mouth and ignored his repeated complaints of excruciating pain for eight days after his jaw re-broke).

Moreover, Epley alleges a *delay* in medical care and pain relief, not a complete denial. A delay in medical care can constitute an Eighth Amendment violation if there was deliberate indifference that results in substantial harm. *Mendoza v. Lynaugh*, 989 F.2d 191, 195 (5th Cir. 1993). Substantial harm occurs when a plaintiff suffers lasting complications from the injury. *Easter v. Powell*, 467 F.3d 459, 464 (5th Cir. 2006).

In referencing his injuries as presented at the Robertson Unit, Epley asks the Court to look at the medical assessments he received at the Lynaugh Unit. Those authenticated records show that, beginning on June 9, the day of his arrival at the Lynaugh Unit—and

three days after his arrival at the Robertson Unit—Epley received comprehensive mental health, medical, vision, and dental screening. Those records document that Epley presented with some bruising, subjective pain, and some limited range of motion in his shoulder. The Lynaugh Unit authenticated records, which Epley asks this Court to consider in screening his claims, directly contradict his claim that his injuries were so severe as to rise to the level of an objectively serious medical need.

As for the subjective component of deliberate indifference, although Epley states that he told Lopez and Blue he was in severe pain, the symptoms he expressed do not alone objectively demonstrate a substantial risk of serious bodily harm. Again, Epley's claim of untreated severe pain is properly construed as a claim of delay—not denial—of pain treatment. At the Lynaugh Unit, providers noted Epley's "moderate distress" and prescribed Tylenol, and Epley concedes that his pain was treated within three days.

Although untreated severe pain can rise to the level of a serious medical need, a three-day delay in treating moderate pain related to non-serious injury does not. *Compare Alderson v. Concordia Parish Corr. Facility*, 848 F.3d 415, 422 (5th Cir. 2017) (finding that denying pain medications prescribed to treat broken ribs and puncture wounds for over a week presented a risk of substantial harm) *with Smith v. Gilley*, Civil Action No. 22-2228, 2022 WL 6814815, at *4–5 (W.D. La. Sept. 19, 2022) (finding the denial of pain medication for 5 days was insufficient to state a claim when a prisoner failed to allege sufficiently severe pain or substantial harm from the delay in care).

Moreover, Epley does not allege any lasting complications from the delay. In fact, the same medical records Epley asks the Court to consider in screening his claims show

that Epley not only received comprehensive medical examinations, but that he declined prescribed x-rays and dental treatment. Further, on June 14, 2016, just six days after he arrived at the Robertson Unit, Epley stated in a medical examination that his injuries were improved. And Epley does not claim that he suffered any serious medical consequences as a result of the three-day delay in receiving medical treatment for his bruises and pain.

Finally, Epley's claim that he did not receive treatment for his diagnosed psychiatric disorders also lacks factual support. In Epley's own statements, he interacted with Blue when she arrived at his cell to dispense his psychiatric medications and each time she returned with his medication, but Epley claims that she ignored his requests for medical treatment. Dkt. No. 63 at 20. Although he claims that he was unable to access some of his doses due to the pain from bending over to access the food tray slot, Epley does not allege that Blue failed to bring them. *Id.* at 9; Dkt. No. 51 at 3–4. Epley continued to receive his prescribed psychiatric medication during his time at the Robertson Unit. *See id.* Moreover, Epley does not claim that he asked for and was denied assistance in reaching the medications dispensed through the tray slot, or that he otherwise made anyone aware of his inability to reach his medications and was ignored. *See* Dkt. Nos. 34, 51, 63. And nothing in the conditions he presented with at the Lynaugh Unit suggest that Epley would have been unable to bend over to retrieve medications during the previous three days Epley he was at the Robertson Unit.

For these reasons, the undersigned FINDS that Epley has failed allege a plausible claim of deliberate indifference to serious medical needs against Lopez and Blue, and

RECOMMENDS that these claims be DISMISSED with prejudice for frivolousness and failure to state a claim upon which relief may be granted.

### 2. *Fourteenth Amendment Claims*

In his Second Amended Complaint, Epley states that Defendants violated his Fourteenth Amendment right to due process through "[o]bstruction of Justice by the defendants, to skirt liability, for the above constitutional violations." Dkt. No. 34 at 3. In his Second Questionnaire Response, Epley appears to clarify his Fourteenth Amendment claim by stating that he is "making claims under the Equal Protection Clause of the 14th Amendment." Dkt. No. 63 at 21.

Although Epley had three opportunities to provide the Court with all facts supporting his Fourteenth Amendment claim through his Second Amended Complaint, First Questionnaire Response, and Second Questionnaire Response, he fails to allege any facts to support such a claim. *See* Dkt. Nos. 34, 51, 63. Instead, Epley appears to assert in a conclusory manner that the alleged denial of medical care and disability accommodations also presents a cause of action under the Fourteenth Amendment.[9] Although pleading precision is not required by a pro se litigant, Epley's use of legal labels and conclusions are insufficient to state a claim. *See Twombly*, 550 U.S. at 555.

---

[9] Even if Epley alleged that he is a member of a protected class, based on his psychological disabilities, he would fail to state a viable Equal Protection Claim. Persons with a disability are not considered to be part of a suspect class for Equal Protection purposes. *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440–41 (1985). Additionally, Epley does allege different treatment based on his disability status because he alleges that his rights were violated in retaliation "for having reported the misuse of force," instead of his status as a disabled individual. *See* Dkt. No. 34 at 3. Thus, Epley has failed to allege a prima facie Equal Protection Clause claim. *See Schweiker v. Wilson*, 450 U.S. 221, 230 (1981).

For these reasons, the undersigned FINDS that Epley has not stated a plausible claim under the Equal Protection Clause of the Fourteenth Amendment against Defendants, and RECOMMENDS that this claim be DISMISSED with prejudice for frivolousness and failure to state a claim upon which relief may be granted.

3. *Retaliation*

Epley alleges that Defendants retaliated against him in violation of the First Amendment for reporting the use-of-force incident at the Montford Unit and requesting medical care, all to prevent Epley from seeking additional medical care. Dkt. No. 34 at 3. Epley also claims that he was subjected to retaliation when he was forced to climb stairs to his assigned Robertson Unit cell under threat of disciplinary action and physical violence. Dkt. No. 63 at 4.

"To prevail on a claim of retaliation, a prisoner must establish (1) a specific constitutional right, (2) the defendant's intent to retaliate against the prisoner for his or her exercise of that right, (3) a retaliatory adverse act, and (4) causation." *Morris v. Powell*, 449 F.3d 682, 684 (5th Cir. 2006) (quoting *McDonald v. Steward*, 132 F.3d 225, 231 (5th Cir.1998)). The Fifth Circuit has recognized that "[t]he prospect of endless claims of retaliation on the part of inmates would disrupt prison officials in the discharge of their most basic duties." *Woods v. Smith*, 60 F.3d 1161, 1166 (5th Cir. 1995). Thus, prisoners' claims of retaliation should be "carefully scrutinized by the courts." *Adeleke v. Fleckenstein*, 385 F. App'x 386, 387 (5th Cir. 2010) (citing *Woods*, 60 F.3d at 1166).

Conclusory allegations, including a prisoner's personal belief that he is the victim of retaliation, are insufficient to support a claim for retaliation. *Jones v. Greninger*, 188

F.3d 322, 325 (5th Cir. 1999) (citing *Johnson v. Rodriguez*, 110 F.3d 299, 310 (5th Cir. 1997)). The Fifth Circuit has held that verbal threats are not sufficient to qualify as a retaliatory adverse act. *See Bell v. Woods*, 382 F. App'x 391 (5th Cir. 2010). And courts are unwilling to find actionable retaliation where threats were not realized. *See, e.g.*, *Arita v. Stagg*, No. 09-0158, 2010 WL 370343, at *3 (M.D. La. Jan. 29, 2010) (alleged retaliatory conduct consisting of threats and verbal abuse was insufficient); *see also Cobb v. Simmons*, No. 2:09-CV-0034, 2009 WL 2016072, at *10–11 (N.D. Tex. July 9, 2009) (threats implying that a major disciplinary action will be brought were insufficient for purposes of retaliation analysis).

Here, Epley alleges that Defendants denied him medical care in retaliation for reporting the Montford Unit officials' alleged attack and for his seeking medical treatment. Dkt. No. 34 at 3, 5. As explained above, Epley was not denied his right to medical care. *See supra* Section.IV.A.1.ii Thus, Epley's failure to state a violation of his rights and reliance on his subjective belief that he is a victim of retaliation is insufficient to state a claim for his alleged retaliatory denial of medical care. *See Jones*, 188 F.3d at 325.

Epley also states that Lopez threatened disciplinary action and physical violence to force Epley to climb stairs to his assigned Robertson Unit cell. Dkt. No. 63 at 4. Here, Lopez's alleged verbal threats of disciplinary action and unrealized threat of violence are factually insufficient to show retaliation. *See Bell*, 382 F. App'x at 391; *see also Arita*, 2010 WL 370343 at *3.

For these reasons, the undersigned RECOMMENDS that Epley's retaliation claims against Lopez and Blue be DISMISSED with prejudice for frivolousness and failure to state a claim upon which relief may be granted.

4. *Conspiracy claims under federal statutes*

Epley claims that, in violation of 42 U.S.C. §§ 1983, 1985, and 1986, Defendants conspired with other TDCJ officials, including those who are defendants in his other lawsuits, to "injure, oppress, threaten, and intimidate" Epley from enjoying his constitutionally protected right to medical care. Dkt. No. 34 at 4. Epley alleges that Defendants denied him medical care and disability accommodations as part of TDCJ's orchestrated effort to avoid incurring liability or creating a medical record paper trail that documents his injuries at the hands of Montford Unit officials. Dkt. No. 63 at 11, 34.

To support his conspiracy claims, Epley alleges that Montford Unit officials directed the Montford-to-Robertson bus driver to give word-of-mouth directions to the Robertson Unit Defendants to deny Epley medical care. Dkt. No. 34 at 11. Epley alleges that after he arrived at the Robertson Unit, the bus driver "rushed toward the security officials," including an unknown officer whom Epley describes as a "large and tall Hispanic security official," and told Robertson Unit officials that Montford Unit officials wanted Epley denied medical treatment and placed in Ad-Seg without going to the infirmary. Dkt. No. 51 at 11, 23–24.

Epley states that the Hispanic security official escorted Epley and other prisoners inside the transit unit, where the official told Lopez that Montford Unit officials wanted Epley to be denied medical care. Dkt. No. 34 at 11. Epley claims that Lopez indicated

understanding and agreement and refused to notify Robertson Unit medical providers of Epley's injuries. *Id.*; Dkt. No. 51 at 24. Epley also claims that when Blue did not take him to the infirmary, as he requested, it was because she "understood Plaintiff was to be denied medical care" and acted in agreement with the conspiracy Dkt. No. 34 at 13.

Additionally, Epley claims that the motivation for the conspiracy was that TDCJ wanted to conceal his injuries and evade personal liability for the Montford Unit officials. Dkt. No. 63 at 6, 11. Epley states that the denial of his medical care was an intentional legal maneuver by Defendants to prevent a paper trail to the Montford Unit officials' alleged attack. *Id.* at 34. He further alleges that his Robertson Unit medical in-take records are falsified because doing so was "the obvious easy way out to evade legal implications."[10] *Id.*

Alternatively, Epley alleges that officials denied him medical care as part of TDCJ's "unwritten code" to join in all violations of an inmate's state and federally protected rights. *Id.* at 23. Epley believes that the fact that he only had contact with Lopez and Blue, who did "not have the authority to order any medical treatment," is evidence of TDCJ's conspiracy to deny medical treatment to prisoners, because prisoners are only permitted to interact with TDCJ officials who are incapable of providing care. *Id.* at 6.

    i.    *Section 1983*

To show a conspiracy under Section 1983, a plaintiff must show that the defendants agreed to commit an illegal act, and that act resulted in the plaintiff's harm. *Hay v. City of*

---

[10] As addressed above, the Court need not consider the alleged falsified medical in-take form included in the authenticated records on this point to screen Epley's claim. *See supra* note 6.

*Irving*, 893 F. 2d 796, 799 (5th Cir. 1990). A plaintiff must plead sufficient facts to show a plausible (1) actual violation of a right protected under Section 1983, and (2) actions taken by defendants together with the specific intent to violate that right. *Kerr v. Lyford*, 171 F.3d 330, 340 (5th Cir. 1999), *abrogated on other grounds Castellano v. Fragozo*, 352 F.3d 939 (5th Cir. 2003). Without an underlying actionable Section 1983 claim, no actionable conspiracy claim exists. *Id.* at 341–42.

In the preceding analyses, the undersigned determined that Epley does not have an actionable Section 1983 claim for denial of medical care, retaliation, or denial of Fourteenth Amendment protections. *See supra* Section.IV.1–3. Moreover, Epley's conspiracy allegations are conclusory, speculative, and insufficient to plausibly support such a claim. *See Iqbal*, 556 U.S. at 678. Without a surviving Section 1983 claim, the undersigned FINDS that Epley cannot have a surviving Section 1983 claim for conspiracy, and RECOMMENDS that this claim be DISMISSED with prejudice for frivolousness and failure to state a claim upon which relief may be granted.

ii.    <u>*Section 1985*</u>

Section 1985 provides a remedy for when a defendant conspires to interfere with another's civil rights. 42 U.S.C. § 1985. Although Epley does not specify under which provision of Section 1985 he brings his claim, only subsection (3) is applicable here. *See Epley*, 2019 WL 2583143 at *13. Section 1985(3) provides a cause of action for a conspiracy to deprive any person of equal protection based on membership in some group with inherited or immutable characteristics. 42 U.S.C. § 1985(3); *see also Flander v. Kforce, Inc.*, 526 F. App'x 364, 369 (5th Cir. 2013) (per curiam). To prove such a claim, a

plaintiff must show (1) membership in a protected class and (2) that defendants engaged in a conspiracy to harm based on that class membership. *See id*.

Epley has alleged no facts showing that he was subject to intentionally discriminatory treatment based on his membership in a protected class. Epley has not stated that Defendants conspired to harm him because he is disabled; rather he claims they conspired against him to prevent him from seeking medical care and to prevent their own legal liability. *See supra* Section.IV.2. These actions, accepted as Epley alleges, were not taken because of his protected status as a person with disabilities but for other nefarious reasons that do not support a conspiracy claim under Section 1985. *See supra* note 9 (explaining how Epley has failed to plausibly allege an Equal Protection Clause claim). As such, the undersigned FINDS that Epley has not stated a plausible claim under Section 1985(3) and RECOMMENDS that this claim be DISMISSED with prejudice for frivolousness and failure to state a claim upon which relief may be granted.

    iii.    *Section 1986*

Finally, Section 1986 provides a cause of action against anyone who had knowledge of an imminent Section 1985 conspiracy and does nothing about it. 42 U.S.C. § 1986. Because the undersigned finds that Epley has not alleged a Section 1985 conspiracy claim, he has likewise not alleged a plausible Section 1986 claim.

For these reasons, the undersigned RECOMMENDS that Epley's claims against Lopez and Blue under 42 U.S.C. §§ 1983, 1985, and 1986 be DISMISSED with prejudice for frivolousness and failure to state a claim upon which relief may be granted.

B.  Claims under the ADA and Rehab Act

Asserting the same operative facts, Epley alleges that Blue and Lopez violated Title II of the ADA and its companion statute, Section 504 of the Rehab Act, when they denied him housing and transportation accommodations for his psychological conditions and severe injuries.[11] Dkt. No. 51 at 3–5. Epley asserts a right to housing in the infirmary and transportation by medical van because of his PTSD, TBI, and injuries from the Montford Unit officials' use of force. Dkt. No. 63 at 7–8. Epley states that this deprivation caused him to suffer excruciating pain, an inability to use the cell toilet, and deprived him of sleep, food, and prescribed medication. Dkt. No. 51 at 3–4. And for these injuries, Epley seeks monetary damages.[12]

As a preliminary matter, because Epley does not specify in which capacity he brings claims against Lopez and Blue, the undersigned considers them as both official and individual capacity claims. As for an individual capacity claim, Epley cannot recover against Defendants in their individual capacity under the ADA. *See, e.g.*, *Cole v. Velasquez*, 67 F. App'x 252 n.11 (5th Cir. 2003) (finding that the ADA's comprehensive remedial scheme bars suits against state officials in their individual capacities). Accordingly, the undersigned analyzes only Epley's claims brought against Defendants in their official capacities.

---

[11] Because "[t]he rights and remedies afforded plaintiffs under Title II of the ADA are almost entirely duplicative of those provided under § 504 of the Rehabilitation Act," the undersigned applies the same analysis to both claims, and refers only to Epley's ADA claims. *See Bennett-Nelson v. La. Nd. of Regents*, 431 F.3d 448, 454 (5th Cir. 2005).

[12] Because Epley fails to plausibly allege a violation of the ADA, the undersigned does not conduct the three-part analysis to determine if Epley's claims may proceed against state officials who normally enjoy Eleventh Amendment immunity from suits for money damages. *See United States v. Georgia*, 546 U.S. 151, 159 (2006).

A suit against a state official in their official capacity "is a suit against the official's office." *Will*, 491 U.S. at 71. And the ADA permits suits against state officials as representatives of the official's office. *United States v. Georgia*, 546 U.S. 151, 154 (2006) (finding that the ADA applies to state agencies and officials). Epley's claims against Defendants, as state officials in their official capacities, are against the Defendants' office as employees of TDCJ Robertson Unit, and thus Defendants are proper parties for claims made under Title II of the ADA.

  1. *Title II of the ADA*

Title II provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. §12132 (current through P.L. 117-80). And compensatory damages are only available under Title II when a plaintiff proves that the discrimination was intentional. *Delano–Pyle v. Victoria Cnty.*, 302 F.3d 567, 574 (5th Cir. 2002).[13]

  i.    <u>*Pleading standard to show a duty to accommodate known disabilities*</u>

To allege a prima facie case under Title II, a plaintiff must bring factual allegations showing: "(1) that he is a qualified individual within the meaning of the ADA; (2) that he is being excluded from participation in, or being denied benefits of, services, programs, or activities for which the public entity is responsible . . . , and (3) that such exclusion, denial of benefits, or discrimination is by reason of his disability." *Smith v. Harris Cnty.*, 956 F.3d

---

[13] Because Epley fails to plausibly allege a prima facie Title II claim, the undersigned does not further develop the 5th Circuit's "'something more than deliberate indifference' standard of showing intentionality" required for an award of money damages. *Cadena v. El Paso Cnty.*, 946 F.3d 717, 724 (5th Cir. 2020) (quoting *Delano-Pyle*, 302 F.3d at 575).

311, 317 (5th Cir. 2020) (quoting *Melton v. Dall. Area Rapid Transit*, 391 F.3d 669, 671–72 (N.D. Tex. 2004)). And a plaintiff may satisfy the third prong of a Title II claim by alleging a failure to accommodate. *Windham v. Harris Cnty.*, 875 F.3d 229, 236 (5th Cir. 2017).

Part A of Title II places an affirmative duty on public entities to reasonably accommodate the limitations that result from a person's disabilities. *Jin Choi v. Univ. of Tex. Health Sci. Ctr. at San Antonio*, 633 F. App'x 214, 215 (5th Cir. 2015). Thus, to allege a failure to accommodate claim, a plaintiff must show that the entity knew of the disability and its consequential limitations, either because the plaintiff requested an accommodation or because the nature of the limitation was open and obvious." *Cadena v. El Paso Cnty.*, 946 F.3d 717, 723–24 (5th Cir. 2020).  The undersigned now addresses whether Epley has plausibly alleged that the Defendants discriminated against him, on the basis of his disability, by refusing to provide him with his requested accommodations.[14]

ii.     *A qualified individual with a disability*

Title II of the ADA defines "qualified individual with a disability" as "an individual with a disability who, with or without reasonable modifications . . . meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2).

---

[14] Courts have interpreted "public entity" to include prisons. *Penn. Dept. of Corr. v. Yeskey*, 524 U.S. 206, 210 (1998). Food and medical care can be benefits provided by prisons to inmates. *See Cadena*, 946 F.3d at 724–25. For the purposes of preliminary screening, the undersigned treats transportation as a benefit under Title II provided to prisoners.

35

In 2008, Congress amended the ADA to expand the meaning of "disability" and broaden protections for persons with disabilities. *Willis v. Noble Env't Power, LLC*, 143 F. Supp. 3d 475, 480–81 (N.D. Tex. 2015). "The definition of disability . . . shall be construed in favor of broad coverage." 42 U.S.C. § 12102(4)(A). Although the ADA amendments expanded protection, making it easier for a plaintiff to allege a qualifying disability, the plaintiff is not absolved from the responsibility to plausibly allege a disability. *Neely v. PSEG Tex., L.P.*, 735 F.3d 242, 245 (5th Cir. 2013). To plausibly allege a qualifying disability, a plaintiff must show an impairment that "substantially limits one or more major life activities." 42 U.S.C. § 12102(a)(1); *see also Ball v. LeBlanc*, 792 F.3d 584, 597 (5th Cir. 2015) (A qualifying disability is one that "substantially limit[s] either a major life activity or the operation of a major bodily function.").

Applicable regulations state that PTSD and TBI are conditions which substantially limit a person's brain function and are therefore a qualifying impairment to show disability. 28 C.F.R. § 35.108(d)(2)(k).

A physical impairment is "[a]ny physiological disorder or condition . . . affecting one or more body systems . . . ."28 C.F.R. § 35.108(b)(1). Courts must consider the condition, manner, and duration of the limitation when determining whether a physical impairment "substantially limits" a major life activity or bodily function. 28 C.F.R. § 35.108(d)(3)(ii).

Beyond the regulation's general guidance, "substantially limits" is not defined by Congress or the Fifth Circuit, and without an absolute definition, "trial courts are left to pinpoint where the impairment falls within the substantial limitation spectrum." *Willis*, 143

F. Supp. 3d at 480–81.[15] To aid this process, courts apply factors, mirroring the regulation's guidance in 28 C.F.R. § 35.108(d)(3)(ii), to determine whether the impairment creates a substantial limitation. *Id.* (citing *Holland v. Shineski*, No. 3:10–cv–0908–B, 2012 WL 162333, at *6 (N.D. Tex. Jan. 18, 2012)). Those factors include "the nature and severity of the impairment; the duration or expected duration of the impairment; and the permanent or long term impact, or the expected permanent or long term impact of, or resulting from, the impairment." *Holland*, 2012 WL 162333 at *6 (citing *Armstrong v. Boehringer Ingelheim, Pharm., Inc.*, No. 3:08–CV–1458–O, 2010 WL 2540751, at *15 (N.D. Tex. June 21, 2010)).

When a physical injury is a short-term, transitory condition with no permanent or long-term impacts, the injury is not a substantial limitation. *Willis*, 143 F. Supp. 3d at 484; *see also Bankhead v. Lifeguard Ambulance Serv. of Texas*, No. 4:18-CV-605-A, 2019 WL 2904364, at *3 (N.D. Tex. July 3, 2019) (finding that an injured ankle, resulting in pain and walking with a medical boot, was a temporary injury and not a disability); *see also Street v. Maverick Tube Corp.*, No. 4:15-CV-02736, 2016 WL 8711338, at *6 (S.D. Tex. June 17, 2016), *report and recommendation adopted*, No. 4:15-CV-2736, 2016 WL 3948106 (S.D. Tex. July 19, 2016) ("[I]t is well-settled that a temporary injury, such as a broken foot, is not considered a 'disability' under the ADA."). Following these trial court determinations, a non-severe condition which causes short-term pain and difficulty

---

[15] The *Willis* case, as well as other cases cited in this section, determine a plaintiff's disability status in the context of employment discrimination claims, which proceed under Title I of the ADA. The amended ADA, however, revised the definition of disability under each title, and so a Title I analysis of "disability" is applicable to the undersigned's Title II analysis here.

walking is not a substantial limitation that rises to a qualifying disability for ADA protections. *See id.*

2. *Analysis of Epley's Claims*

Epley claims that Defendants violated his rights under the ADA and Rehab Act by failing to provide housing and transportation accommodations for his psychological conditions and his physical injuries from the Montford use-of-force incident. Dkt. No. 51 at 3–5; Dkt. No. 63 at 7–8.

Epley states that to access the food-tray slot in his single-occupancy cell, he was required to bend his knees or to bend over, which caused severe pain. Dkt. No. 63 at 3. He states that while in his single-occupancy cell he suffered excruciating pain, sleep deprivation, deprivation of food trays and medication, and that he fell when attempting to use the toilet. *Id.* at 9; Dkt. No. 51 at 3–4, 18. To accommodate his physical injuries and psychological conditions, Epley alleges that he needed to be placed in the Robertson Unit infirmary in a medical bed with railings, a pain-reducing mattress, and an electric motor to raise and lower the bed. Dkt. No. 63 at 3.

Epley also alleges that the transportation conditions exacerbated his existing injuries and aggravated his psychological conditions. Dkt. No. 51 at 4–6. Epley claims that he suffered excruciating pain from being denied a transportation accommodation, stating that he was transferred by TDCJ bus and handcuffed to another prisoner, which caused severe pain because he was unable to move. *Id.*

i.    *Psychological conditions*

As alleged, Epley is a disabled individual due to his psychological conditions. He states that he suffers from PTSD and TBI-related complications, and those diagnoses are recorded in his TDCJ medical records. Therefore, the undersigned FINDS that Epley has plausibly alleged a qualifying disability as defined by the ADA and Rehab Act.

The known limitations of that disability, however, were reasonably accommodated. Defendants satisfied Epley's housing accommodation due to his psychological limitations by placing him a single-occupancy cell in the Ad-Seg building. In his Second Questionnaire Response, Epley failed to support his allegation that his psychological limitations were not satisfied with his housing in a single-cell.[16] *See* Dkt. No. 63 at 10. Accordingly, the undersigned FINDS that Epley fails to allege sufficient facts to plausibly support that the Defendants or TDCJ failed to make reasonable accommodations for Epley's then-known limitations.

As for Epley's claim for a transportation accommodation for his psychological limitations, he asserts that transportation in the TDCJ bus placed him next to another prisoner and aggravated his conditions. Dkt. No. 51 at 4–6. Epley asserts that he had a right to transportation in a medical van. *See* Dkt. No. 63 at 11.

---

[16] Although Epley alleges that his single cell was "no longer sufficient" for his needs, he states that his "medical needs were far more urgent and comprehensive" because he suffered additional injuries to his head and broken bones. Dkt. No. 63 at 10. Specifically, Epley states that "[b]eing housed in the Robertson infirmary would have been a step in the right direction" towards treating the "brain swelling inside [his] skull." *Id.* at 11. These allegations are both conclusory and relate only to his alleged physical impairments. These allegations fail to plausibly demonstrate that the single-occupancy cell in the Ad-Seg building was insufficient for his psychological needs.

Epley has not stated facts showing that Lopez or Blue knew that Epley required a transportation accommodation because of his psychological limitations. *See* Dkt. No. 51 at 4–6. To state a plausible claim against a public entity, "a plaintiff must show that the entity knew of the disability and its consequential limitations, either because the plaintiff requested an accommodation or because the nature of the limitation was open and obvious." *Cadena*, 946 F.3d at 723–24.

Here, Epley has not pleaded sufficient facts showing that he either requested a transportation accommodation or that his need for one was open and obvious. When specifically asked in his Second Questionnaire to provide facts supporting that Defendants were aware of his need for a transportation accommodation, Epley did not answer the question. Dkt. No. 63 at 30–31. And nowhere in Epley's pleadings does he state that he asked for such an accommodation. Instead, under a liberal construction, Epley only states that Defendants should have known of the need for transportation in a smaller vehicle, like a medical van, because he had a single-cell accommodation. *See* Dkt. No. 51 at 4–6.

Epley's psychological conditions, however, did not create an open and obvious need for accommodation such that Defendants had an affirmative duty to ensure that Epley received transport in a smaller vehicle. Epley arrived at the Robertson Unit in a TDCJ bus, and his prison records, which document his housing accommodation, do not note a need for a transportation accommodation. *Cf. Epley*, 860 F. App'x at 314 (finding that Epley stated a plausible claim for transportation accommodations because Montford officials knew Epley arrived in a medical van and had increased impairments while there).

An impairment requiring housing in a solitary cell assignment does not logically and plausibly lead to a need for transportation in a medical van, which is not a solitary mode of transportation. And further, a public entity is required to provide *reasonable* accommodations and Epley fails to plausibly support how the alleged failure to ensure his transportation via private medical van constituted a denial of a reasonable accommodations for Epley's psychological limitations then known to the Defendants.

For these reasons, the undersigned RECOMMENDS that Epley's claims against Defendants for failing to provide accommodations for his psychological limitations under Title II be DISMISSED with prejudice for failure to state a claim upon which relief may be granted.

ii.    *Physical Injuries*

Epley claims that Defendants denied him housing and transportation accommodations for his disabilities caused by the injuries from the Montford use-of-force incident on June 6, 2016. Dkt. No. 51 at 4–5, 7; Dkt. No. 63 at 7–8.

Epley cannot state a Title II claim for failure to accommodate with regard to his physical injuries. Unlike his psychological conditions, Epley's physical injuries are not within the definition of a qualifying impairment because his injuries were temporary, mild, and resolved without complications or lasting effects. *See Willis*, 143 F. Supp. 3d at 484.

Medical records show that Epley's injuries resolved soon after he left the Robertson Unit. Although those injuries as alleged caused Epley painful movement when walking, climbing stairs, and bending over, painful movement from a short-term and non-severe injury is not a substantial limitation. Even if Epley had "broken bones" at the time, as he

states, painful movement from a broken bone is not a qualifying impairment. *See Bankhead*, 2019 WL 2904364, at *3 (finding that a broken ankle and decreased mobility was not a qualifying impairment). And Epley has not plausibly alleged any injury as severe as a broken bone. He states that the medical examination at the Lynaugh Unit properly documented his injuries, and those medical records show scratches, bruising, and mild distress, and when medical providers ordered x-rays to rule out any potential fractures, Epley declined the diagnostics. Further, Epley's physical injuries substantially resolved within one week of the injury date. The Montford Unit use-of-force event happened on June 6, 2016, and Epley stated in a follow-up visit on June 14, 2016, that his pain was getting better.

Finally, Epley appears to allege that because he struggled to walk due to his painful injuries, Defendants violated his ADA rights by placing him in a second-floor cell, forcing him to climb stairs. Dkt. No. 63 at 3–4. This statement, however, similarly fails to show disability status through an impairment that substantially limits Epley's ability to walk. Epley states he walked into the Ad-Seg building, and that he climbed the stairs, although it caused pain. While Epley states that he had generalized pain in his knees (Dkt. No. 34 at 4–5), the Lynaugh Unit medical evaluation completed three days later—the accuracy of which Epley does not dispute—does not document any complaint or condition related to mobility or his knees. Because his pain was not so severe as to prevent him from walking or climbing stairs, and the pain resolved within three days without further complications, Epley does not allege facts plausibly showing an impairment that was a substantial limitation, and thus cannot assert a plausible claim associated with his second-floor cell.

The undersigned FINDS that Epley fails to allege sufficient facts to plausibly support that he had physical injuries that constituted a qualifying disability, and thus, Epley fails to satisfy the first element of a prima facie failure-to-accommodate claim under the ADA.

For these reasons, the undersigned RECOMMENDS that Epley's claims against Defendants for failing to provide accommodations for his physical limitations under Title II be DISMISSED with prejudice for frivolousness and failure to state a claim upon which relief may be granted.

C.  State law claims

Epley asks the Court to exercise diversity and supplemental jurisdiction to enforce claims made under state civil and criminal law. Dkt. No. 34 at 6.[17] In the preceding analysis, the undersigned has recommended that the Court dismiss Epley's federal law claims under 42 U.S.C. § 1983, 1985, 1986, the ADA, and Section 504 of the Rehab Act. Ordinarily, when the federal claims are dismissed before trial, the court may decline to exercise supplemental jurisdiction and dismiss pendent state claims as well. 28 U.S.C. § 1367(c)(3); *see also United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1996); *St. Germain v. Howard*,

---

[17]Epley states that the Court has diversity jurisdiction because he "is a citizen of France who resides in France," and he sues Defendants who are presumptively citizens of Texas. *See* Dkt. No. 34 at 6. "[A] prisoner may rebut the presumption that he retains citizenship of the state of which he was a citizen prior to his incarceration by showing that he intends to reside in another state after his release." *Davis. v. Guthrie*, Civil Action No. 3:13-cv-1704-O, 2014 WL 46130 (N.D. Tex. Jan. 6, 2014). However, Epley initially filed this case when he was incarcerated by the TDCJ and prior to his incarceration, Epley was domiciled in the state of Texas. And Epley never expressed to the Court his intention to reside in another state until after he filed this action. "[W]hether federal diversity of citizenship jurisdiction exists is determined by examining the citizenship of the parties at the time the action is commenced." 13E Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 3608 (3d ed. Apr. 2022 update). Accordingly, for purposes of determining citizenship for diversity jurisdiction in this action, Epley was a citizen of Texas at the time of filing this action. Thus, diversity jurisdiction does not exist.

556 F.3d 261, 264 (5th Cir. 2009) (citing 28 U.S.C. § 1367(c)). The decision to exercise supplemental jurisdiction is discretionary and subject to the Court's determination when all original jurisdiction claims have been dismissed. *St. Germain*, 556 F.3d at 263–64 (citing § 1367(c)). "The relevant considerations are 'judicial economy, convenience, fairness, and comity.'" *Villas at Parkside Partners v. City of Farmers Branch*, 577 F. Supp. 2d 851, 857 (N.D. Tex. Aug. 29, 2008) (citing *Batiste v. Island Recs., Inc.,* 179 F.3d 217, 227 (5th Cir.1999)).

In this case, the Court should decline to exercise supplemental jurisdiction over Epley's remaining state civil law claims, including intentional torts and spoliation of evidence. Epley's state law claims are nothing more than an attempt to assert the causes of action already addressed by the undersigned under additional legal theories to avoid having his case dismissed. *See* Dkt. No. 63 at 21–22. And to the extent Epley attempts to make allegations other than the claims addressed by the undersigned, any such claims are devoid of factual support and amount to nothing more than than his subjective belief that the Defendants violated his rights.[18]

Next, Epley alleges that Defendants also violated TEX. PENAL CODE § 22.04 by causing serious bodily injury to a disabled individual. Dkt. No. 34 at 7–8. Epley states that he is a disabled person, as defined by the statute, because he was 61 years old at the time of filing, and has qualifying medical and psychological conditions. *Id.* Epley, however, cannot compel the Court to enforce a state criminal statute, as it is well-settled that state

---

[18] Epley provides little to no support for his state law claims and asserts that he "ha[s] these legal claims even if [he is] unable to legally argue them." Dkt No. 63 at 21. Although Epley is not required to legally argue these claims, he is required to provide factual support for his claims.

criminal statutes do not give rise to a private cause of action. *See D.C. Ct. of Appeals v. Feldman*, 460 U.S. 462 (1983); *Rooker v. Fid. Tr. Co.*, 263 U.S. 413 (1923).

For these reasons, the undersigned FINDS that the Court should decline to exercise jurisdiction over Epley's state civil and criminal law claims, and RECOMMENDS that all state law claims be DISMISSED without prejudice for lack of subject matter jurisdiction.

## V.  CONCLUSION

For the reasons explained in these Findings, Conclusions, and Recommendations, the undersigned RECOMMENDS that all of Epley's claims be dismissed as follows:

1. Epley's claims under the First, Eighth, and Fourteenth Amendments be DISMISSED with prejudice for frivolousness and failure to state a claim.

2. Epley's claim that Defendants failed to accommodate his psychological disabilities be DISMISSED with prejudice for failure to state a claim.

3. Epley's claim that Defendants failed to accommodate his physical disabilities be DISMISSED with prejudice for frivolousness and failure to state a claim.

4. Epley's state civil and criminal law claims be DISMISSED without prejudice for lack of subject matter jurisdiction.

## VI.  RIGHT TO OBJECT

A copy of these Findings, Conclusions, and Recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of these Findings, Conclusions, and Recommendation must file specific written objections within fourteen days after being served with a copy. *See* 28 U.S.C. § 636(b)(1) (2017); FED. R. CIV. P. 72(b). To be specific, an objection must identify the specific finding or recommendation to

which objection is made, state the basis for the objection, and specify the place in the magistrate judge's Findings, Conclusions, and Recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

## VII.  TRANSFER OF CASE

Having completed the preliminary screening of Epley's claims under 28 U.S.C. §§ 1915(e)(2), the undersigned ORDERS that this case be TRANSFERRED back to the docket of the Senior United States District Judge and designated as Civil Action No. 1:18-CV-00115-C.

ORDERED this 27th day of February, 2023.

_____
JOHN R. PARKER
UNITED STATES MAGISTRATE JUDGE